The STATE of Ohio, Appellee,

v.

JONES, Appellant.

[Cite as *State v. Jones* (2000), 140 Ohio App.3d 422.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 77841.

Decided Dec. 18, 2000.

*Lee Koosed,* South Euclid Prosecutor, for appellee.

*Mark A. McClain,* for appellant.

---

KENNETH A. ROCCO, Presiding Judge.

Defendant-appellant Darlene Jones appeals from her convictions on two counts of domestic violence after a jury trial in the South Euclid Municipal Court.

Appellant asserts that the trial court improperly denied her motions for acquittal, arguing that her convictions are neither based upon sufficient evidence nor sustained by the weight of the evidence. Appellant also asserts that the trial court improperly excluded expert testimony she sought to introduce at trial.

This court has reviewed the record and determines that appellant's convictions are supported by the evidence. Furthermore, no error can be found in the trial court's evidentiary decision. Therefore, appellant's convictions are affirmed.

Appellant's convictions result from an incident that occurred on May 5, 1999, at her home in South Euclid, Ohio. On that afternoon, after completing her work as a teacher's aide in a class for children with special needs, appellant proceeded to Greenview Middle School to retrieve her eleven-year-old son.[1] As he entered the vehicle, appellant's son "immediately handed"[2] her a "detention slip" from one of his teachers.

Appellant's initial reaction of cautious congratulations to her son for his honesty quickly turned to confusion. Appellant noted the date of her son's

---

1. Appellant's son and daughter had been adopted by appellant and her husband in 1995.

2. Quotation marks indicate testimony given by a witness at appellant's trial.

transgression, upon which the detention was based, was stated as "six months ago."

Appellant thereupon drove home with her son. Her husband and nine-year-old daughter already had arrived from work and school. While appellant's daughter did her homework, and with appellant's husband listening, appellant placed a telephone call to the teacher who had issued the detention to her son. Appellant sought an explanation for the delay in issuing a consequence for behavior that apparently had occurred so much earlier in the school year.

Appellant's conversation with her son's teacher indicated that a note the teacher had attached to the detention slip was missing. As appellant was speaking on the telephone, her husband observed that "the paper [of the detention slip] had been cut and the note was gone." Moreover, when appellant's husband checked his son's "daily planner book," he noticed "a staple * * * had been removed" and a note to them from another teacher "had been marked over with black magic marker."

Appellant ended her telephone conversation at that point. The two parents then confronted their son about the defacing of the two school items. Their son told them his teacher "never wrote a note" and denied defacing the papers.

Both parents believed their son was lying. This belief was a source of much distress for them, since the son's dishonesty at school had been a disciplinary issue for some time. For several months previously, appellant and her husband had attended special parent-teacher conferences, had closely monitored their son's behavior, and had withdrawn many of their son's privileges in an effort to "change his behavior."

Appellant's husband expressed his displeasure by stating to his son, "I don't believe you." He punctuated this statement by "hit[ting] him twice on the behind with [his] hand." Since appellant's husband had planned to accomplish an errand, he then announced, "Your mother's dealing with this," and left the home.

Appellant informed her son she would "have to spank [him]." Prior to meting out that punishment, however, she "gave [him] time to kind of think about it" by ordering him to his room and then, "three or four times," waiting and entering it to request of him if he were "ready to tell the truth." Each time, appellant's son insisted that his teacher was lying.

Finally, appellant went to her bedroom and retrieved her belt. She returned to her son's room and told him, "I'm going to have to make this hurt for a time." Appellant "spanked" him with the belt; however, as she did so, her son "started flipping" in an effort to avoid the blows. Appellant persisted in her efforts to administer the punishment until she determined that it was time to "calm down." She then told her son to "take a shower."

When appellant's son had finished that task, he approached her and "confess[ed] to everything." Appellant's husband returned home from his errand to find the two talking but his wife "very distraught." Appellant informed her husband that she "needed to leave the house for a while because she just needed to get away."

A few hours later, appellant reappeared; thus, her husband retired to bed for the night. A short time later, appellant noticed her son near the second floor shower stall; he was "using [a] bucket of water and splashing it into the shower." When she inquired the reason he was engaged in this activity, he directed her attention to the floor of the shower stall, where a quantity of "toilet paper" lay.

Appellant previously had spoken to her daughter "on several occasions" concerning her daughter's "doing an experiment" by placing "wads of toilet paper in the shower." She thereupon brought her children together and demanded to know which of them had perpetrated the act. Both of the children denied doing so.

For this infraction, appellant initially required the children to "do positions," i.e., to hold "a push up position or * * * squatting position" for a certain length of time. If they were "out of form," they "would be swatted with a belt to correct that form."

Appellant's daughter ultimately confessed to placing the tissue in the shower. Appellant then administered to her daughter a punishment of about three licks with her belt; however, appellant's daughter twisted in an effort to escape the blows. Appellant then ordered both children to bed.

The following day, appellant notified her before-school care provider, Veda Rawlings, both that her son would not be in attendance that day and that her daughter was "on punishment." Appellant requested that her daughter "sit in the corner" for the day. Rawlings did not agree with this request, but the request focused her attention on appellant's daughter. When Rawlings observed a "big red nasty-looking bruise" on the girl's forehead, she inquired about it. Appellant's daughter initially stated she "fell," but the answer did not satisfy Rawlings. Rawlings brought the girl's appearance to the attention of her third-grade teacher. The teacher, in turn, contacted the school's social worker, Maureen O'Sullivan.

Appellant's daughter eventually disclosed to O'Sullivan the punishment to which she and her brother had been subjected the previous evening. At that point, O'Sullivan contacted the counselor of the middle school appellant's son attended, "the county," and the police department regarding appellant's daughter's disclosure. O'Sullivan's concern was based upon her observation of "marks" on the daughter's face.

Subsequently, the middle school counselor and middle school nurse observed appellant's son's legs and torso. The counselor saw "welts," and the boy's "shoulders, [and] his back [were] almost completely encompassed in some form of bruising * * * [and his] legs were bruised to some extent."

The children both were transported to a local hospital for medical evaluations. Although the children ultimately required no treatment for their injuries, police officers assigned to investigate the injuries of the children took photographs of the significant areas where injuries had occurred. A police detective also issued complaints against appellant and her husband, charging them each with two violations of R.C. 2919.25(A), domestic violence.

Appellant and her husband ultimately were tried together to a jury. The city prosecutor presented the testimony of the following witnesses: the children, Rawlings, O'Sullivan, the middle school nurse and counselor, several of the investigating police officers, a social worker assigned to the family by the county's department of children and family services, and appellant's son's middle school teacher. The city prosecutor also introduced into evidence numerous photographs of the children's injuries taken on May 6, 1999.

Following the trial court's denial of their motions for acquittal, appellant and her husband testified in their own behalf and also presented the testimony of a neighbor. The trial court refused to permit the defense to present the testimony of two licensed social workers who recently had conducted "assessments" of the children.

The jury ultimately returned verdicts finding appellant's husband not guilty but appellant guilty of the two charges. Following a presentence investigation and report, the trial court, on each charge, sentenced appellant to one hundred eighty days in jail and imposed a fine of $1000. The foregoing penalties were suspended, however, and the trial court placed appellant on two years of conditional probation.

Appellant has filed a timely appeal of her convictions. She presents three assignments of error for review. Appellant's first two assignments of error are addressed together as follows:

"I. The judgment rendered in the trial court was unsupported by the evidence and was against the manifest weight of the evidence.

"II. The trial court abused its discretion by denying appellant consideration of her Rule 29 motion under the proper elements of the crime."

Appellant asserts that the trial court erred in denying her motions for acquittal, arguing both that her convictions are based upon insufficient evidence and that the trial court applied an improper standard in considering her motions.

Appellant further asserts that her convictions are not sustained by the weight of the evidence. This court disagrees.

A defendant's motions for acquittal should be denied if the evidence is such that reasonable minds could reach different conclusions as to whether each material element of the offense has been proven beyond a reasonable doubt. *State v. Dennis* (1997), 79 Ohio St.3d 421, 683 N.E.2d 1096; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492; *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184. The trial court is required to view the evidence in a light most favorable to the state. *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717.

With regard to an appellate court's function in reviewing the weight of the evidence, the Supreme Court has set forth the following as the relevant analysis:

"Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. (Citation omitted.) * * *

"When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs* [*v. Florida* (1982) ], 457 U.S. [31], at 42, 102 S.Ct. [2211] at 2218, 72 L.E.2d [652] at 661. See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720–721 ('The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether *in resolving conflicts in the evidence,* the jury *clearly lost its way* and created such a *manifest miscarriage of justice* that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')." (Emphasis added.) *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 546–547.

Thus, this court must be mindful that the weight of the evidence and the credibility of the witnesses are matters primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

R.C. 2919.25(A) states:

"No person shall knowingly cause or attempt to cause physical harm to a family or household member."

In reviewing the foregoing statute in the context of a parent-child relationship, the Supreme Court of Ohio indicated that the legislature did not

intend to prohibit "proper and reasonable parental discipline" but, rather, incidents of corporal punishment that cause substantial physical injuries. *State v. Suchomski* (1991), 58 Ohio St.3d 74, 567 N.E.2d 1304; *State v. Hicks* (1993), 88 Ohio App.3d 515, 624 N.E.2d 332; cf. *State v. Ivey* (1994), 98 Ohio App.3d 249, 648 N.E.2d 519 (construing R.C. 2919.22, endangering children).

The jury in this case was presented with the testimony of the two children, ages eleven and nine at the time of the incident. Both testified that appellant's efforts to discipline them eventually led to her retrieval of her belt. Appellant's daughter stated she had a "mark" on her forehead after appellant's discipline; appellant's son stated that appellant struck him "a couple of times" with her belt. Appellant's husband indicated that appellant was "distraught" that evening.

Rawlings, the school counselors, and the police officers who viewed the children the following day all observed welts and bruises on their bodies. Their testimony is corroborated by the photographs taken of the children. This evidence supports a conclusion the children suffered physical harm as a result of appellant's actions. *State v. Suchomski, supra; State v. Flinn* (Mar. 20, 1997), Licking App. No. 96CA118, unreported., 1997 WL 219502

Furthermore, appellant's daughter's comment to Rawlings that appellant instructed her to tell anyone who inquired that she had fallen "reflects a conscious awareness" on appellant's part that her disciplinary action would result in bodily injury. *Reynolds v. White* (Sept. 23, 1999), Cuyahoga App. No. 74506, unreported, 1999 WL 754496.

Viewing the evidence in a light most favorable to the state, therefore, a rational factfinder could conclude that sufficient evidence was presented to support each element of a violation of R.C. 2919.25(A). *State v. Buchanan* (May 17, 1999), Clermont App. No. CA98–09–077, unreported, 1999 WL 326195; cf. *State v. Mills* (Mar. 26, 1997), Hamilton App. No. C–960482, unreported, 1997 WL 133430; *State v. Wagster* (Mar. 27, 1996), Hamilton App. No. C–950584, unreported, 1996 WL 134538. The trial court thus did not err in overruling appellant's motions for acquittal.

■ In considering appellant's claim that her convictions are against the weight of the evidence, this court must consider whether appellant sustained her burden of proof with regard to her affirmative defense that she used only "proper and reasonable parental discipline." *State v. Hauenstein* (1997), 121 Ohio App.3d 511, 700 N.E.2d 378; *State v. Hart* (1996), 110 Ohio App.3d 250, 673 N.E.2d 992; *State v. Wagster, supra.*

"Proper" and "reasonable" have been defined as "suitable or appropriate" and "not extreme or excessive." *Id.; State v. Hicks, supra; State v. Blevins* (1999),

133 Ohio App.3d 196, 727 N.E.2d 169; *State v. Esparza* (Mar. 4, 1999), Defiance App. No. 4–98–18, unreported, 1999 WL 155955.

■ "Whether any given conduct is reasonable is a question that must be determined with reference to all the relevant facts and circumstances." *State v. Hause* (Aug. 6, 1999), Montgomery App. No. 17614, unreported., 1999 WL 959184 Relevant facts and circumstances include the child's age, the child's behavior that led to the parent's action, the child's response to noncorporal punishment, and the location and severity of the punishment. *State v. Hart, supra; State v. Howard* (Dec. 3, 1999), Lake App. No. 98–L–265, unreported, 1999 WL 1313691. To this list must be added the parent's state of mind while administering the discipline. *State v. Hauenstein, supra; State v. Wagster, supra; Galion v. Martin* (Dec. 12, 1991), Crawford App. No. 3–91–6, unreported, 1991 WL 261835.

This case concerned children under the age of twelve rather than defiant and obstreperous teenagers. Both children had engaged only in activities typical of their age group, *viz.,* neglect of school rules, placing toilet tissue in a forbidden place, avoiding the truth, and evasion.

At the time the incident occurred, appellant had not spent a significant amount of time in administering noncorporal punishment for the foregoing relatively minor offenses. Instead, she determined to spank the children with a belt. Appellant then struck them repeatedly with it as she chased them around a room.

Appellant's choice of punishment was inappropriate for the offenses committed, and her behavior in administering that punishment clearly lacked reason. Moreover, the fact that appellant's punishment raised welts indicates its excessive nature. *State v. Suchomski; State v. Blevins; State v. Hicks; Galion v. Martin;* cf. *State v. Ivey; State v. Hauenstein; State v. Hause; State v. Wagster.* Thus, appellant's convictions are not against the manifest weight of the evidence.

Appellant makes the further assertion in these assignments of error that in considering her motions for acquittal, the trial court applied an improper legal standard. Appellant bases this assertion on comments made by the trial court during sentencing.

A review of the challenged remarks, however, demonstrates that the trial court properly assessed the evidence of the potential for substantial physical harm resulting from appellant's disciplinary actions. *State v. Blevins; State v. Buchanan;* cf. *State v. Hart; State v. Hicks; State v. Mills.*

For the foregoing reasons, appellant's first two assignments of error are overruled.

Appellant's third assignment of error states:

"The trial court committed prejudicial error when it excluded the testimony of appellant's licensed social worker experts."

■ Appellant argues that the trial court improperly excluded the testimony of two defense witnesses that she asserts would have offered evidence concerning whether her children "displayed characteristics of children on whom physical violence [was] inflicted." Appellant's argument is unpersuasive.

■■ The decision to admit or exclude evidence is a matter that rests within the discretion of the trial court; an appellate court will not disturb the trial court's decision absent a showing the trial court abused its discretion and, further, that the defendant suffered material prejudice. *State v. Martin* (1985), 19 Ohio St.3d 122, 129, 19 OBR 330, 336, 483 N.E.2d 1157, 1164; *State v. Hicks, supra.*

Appellant was charged in this case only with committing a single incident of domestic violence upon each of her children. The evidence demonstrated that the offense occurred on an evening when appellant's efforts to control her children's behavior exceeded that which was appropriate. The evidence appellant sought to introduce through her two experts, therefore, was not really relevant to the central issue in the case. Evid.R. 402.

■ Moreover, to the extent that appellant intimates in her argument with respect to this assignment of error that her children were not being truthful, an expert may not testify as to his opinion of the veracity of the statements of a child. *State v. Boston* (1989), 46 Ohio St.3d 108, 128–129, 545 N.E.2d 1220, 1239–1241.

Since the record thus fails to reflect that the trial court abused its discretion when it refused to allow the testimony of appellant's expert witnesses, appellant's third assignment of error also is overruled. *State v. Buchanan, supra.*

Appellant's convictions are affirmed.

*Judgment affirmed.*

MICHAEL J. CORRIGAN, J., concurs.

JAMES D. SWEENEY, J., dissents.

JAMES D. SWEENEY, Judge, dissenting.

I respectfully dissent from the majorities determination.

In an effort to minimize the children's conduct, the majority characterizes their activities, *viz.*, neglect of school rules, placing toilet tissue in forbidden places,

avoiding the truth, and evading responsibility as conduct typical of their age. That determination is totally unwarranted.

The majorities characterization of the children is also incredibly incomplete. When the parents adopted the children at ages five and seven, respectively, the children were certainly not well adjusted. The parents were told at the time of adoption that if they had anything nice in the home these physical possessions should be removed because the children would destroy them. The children had never been in a store or on a vacation prior to adoption. The boy had been prescribed forty grams of Ritalin per day to moderate his disruptive behavior. To this litany of undesirable behavior should be added Willie's theft of $40 from a teacher, forging the parents' signatures on school documents, stealing and concealing detention slips from the school, and, in an egregious example of misconduct, falsely accusing one of his teachers of racism even after having been warned that this type of allegation could jeopardize the teacher's continued employment at the school.

It should also be noted that, over the years, the parents attempted an escalating series of noncorporal punishment to bring the children's behavior into line, *viz.*, restricting and/or eliminating television and videogame privileges, having the children write repetitiously, and arranging a mock trial at the South Euclid Municipal Court to "scare Willie straight."

It appears then that the parents developed a philosophy of progressive discipline and that corporal punishment was used only as a last resort when less drastic measures had proved ineffective.

The central issue in this case is how the defendants are to meet their burden of affirmatively showing that the corporal punishment was proper and reasonable under the circumstances. How is this to be accomplished if not by the use of expert witnesses? Contrary to the assertion of the majority that the proffered expert testimony would have spoken to only evidence concerning whether the children "displayed characteristics of children on whom physical violence [was] inflicted," the proffered evidence disclosed that the experts would have testified to the ultimate fact in this matter, *i.e.*, that there was no unreasonable punishment and that the children were not abused.

The defense theory was that these two social workers would have testified that abused children exhibit particular psychological issues and that the children at issue were, in their expert opinion, not abused, inferring that the children did not exhibit these particular psychological issues, which are indicative of an abused child. The state based its objection on this testimony not being relevant evidence; however, the stated reasoning behind the objection reveals that the basis is not truly "relevance" but "cumulative" evidence as indicated by the reliance on the previous testimony by a number of witnesses.

It would appear that this expert testimony was relevant to the determination of the action, *i.e.*, the defense of whether the parent used proper and reasonable discipline under the circumstances, since relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." See Evid.R. 401. Although relevant evidence, it may be precluded according to the discretion of the court as a "needless presentation of cumulative evidence." See Evid.R. 403(B).

The case boils down to the children's word against the parents' word as to whether the wounds were totally inflicted by the parent. Thus, the proffered evidence was, contrary to the majority, relevant evidence, as it tends to make the existence of the fact of abuse less probable. The proffered evidence, albeit scantily detailed in the record, does not appear to constitute the "needless presentation" (and I stress the word "needless") of cumulative evidence because it goes to the heart of the action and is the defendant's only use of expert witnesses. The proffered evidence can also be considered to be not cumulative in that there was no other *expert* evidence put on by the defense. I make no prediction as to the weight the jury would have ascribed to this proffered evidence, nor do I predict the ultimate determination of the jury in light of this evidence. However, I think the jury should have had the opportunity to hear this evidence. Accordingly, I would affirm the third assignment of error and reverse and remand.